The third and fourth cases of today are 2013-20569 and 2013-20751, Culbertson v. Lykos et al. May it please the Court, my name is Scott Cook and I represent Amanda Culbertson and Jorge Wong. This case involves very important issues regarding the protection of First Amendment rights and the ability of citizens to speak out against the government. This appeal largely involves what must be pled initial pleadings to even file a First Amendment retaliation case without summary dismissal. The plaintiffs in this case were former crime lab technicians with the Houston Police Department Crime Lab who spoke out publicly about issues with the integrity of that crime lab and specifically breath alcohol testing vans or bat vans. In retaliation, the defendants in this case campaigned to harm the plaintiffs by defaming their reputation, by threatening them with prosecution, and ultimately by causing the elimination of their jobs. The plaintiffs filed First Amendment retaliation claims under Section 1983 and state law tortious interference claims. Would you classify your client forming for purposes of First Amendment jurisprudence of the public employees and contractor labels of the private citizens? I think it's a tough call, Your Honor, especially on the pleadings. I think once more facts are out, it will be easier to make that call. I think it's more an ordinary citizen test where it stands now, consistent with Keenan v. Tejada. I think the reason is because these employees were speaking about their former jobs, and there's not a huge – in the pleadings, at least, there's not a lot of facts between the connection as to their current job. Well, we do have independent contractor cases. The Inbank – Kenny Weaver, I think it was – decision, also employed by a colleague. Were they speaking at the time as employees of Lone Star – not as, as is an important word here – while employed at Lone Star? Their testimony, their statements to the press, were they employees of Lone Star at that time? Yes, Your Honor, they were employees. I do not think they were speaking as employees. Okay, I was trying to avoid the as word. Okay. They were, Jim. What about were they still in the – did they still have the obligation during that period of employment of testifying on – about tests, about blood alcohol tests that they were complaining about? Were they still – did they still have that obligation? Your Honor, I think that if we stick to the pleadings, I think that the answer is that that's not clear. I mean, the pleadings state that, for instance, Ms. Palmer, the defendant in one of these cases, said that she wasn't going to rely on one of the plaintiffs to testify at all in breath alcohol tests. I'll say that again, and then I wouldn't quite follow. Sure. I think in the pleadings, we state that Ms. Palmer stated that she would not use the plaintiffs again in breath alcohol testing cases going forward. So I don't think it's clear exactly what the function would be. Certainly, the pleadings show that in this job there's multiple functions. When they were at Lone Star College, they were actually going to be testifying in regards to the Harris County Sheriff's Office. So they would not be testifying regarding the HPD bat vans, which they specifically spoke out against. Okay. So does the Lane case help you in this regard that the Supreme Court's Lane be franks? Because it's testimony, and even if it has to do with the people's jobs, testimony is a quintessential public citizen function. So how much of this is testimony so that this would be covered by Lane and protected and not subject to Garcetti? Yeah, I think Lane does help out. Lane's not exactly on point, Your Honor. I think that the point that Lane makes is, from the very beginning of the opinion, is talking about how important public speech is in court. You owe a duty to the court. You owe a duty to the public when you testify. Well, I'm asking what the speech at issue, is it all some sort of testimony? No, Your Honor. Part of it. What is it? Which is testimony and which is not? One of the protected areas of speech was when Ms. Culbertson testified under subpoena by defense counsel. So that would be a Lane situation? I think so, Your Honor. You're subpoenaed by the defense. That's exactly like Lane, where they're subpoenaed by one of the parties. I think so, Your Honor. Well, subpoenaed, but her job was testifying, was it not, to talk about a particular thing? Was she also called by – subpoenaed by the defendant, but she also testified on behalf of the prosecution? Because this was cross-examination, as I recall, when a particularly disturbing to the police officers testimony was given. So she must have been called as a witness, whether she was subpoenaed by the government. My understanding, Your Honor, is she was subpoenaed by defense counsel. Right, but she was cross-examined by defense counsel, which sounds to me as if she was initially called to the stand by the prosecution. My understanding is that she was initially called to the stand by the defendant in that case. I may be mistaken, Your Honor. Is the situation really that she was subpoenaed by the defendant's counsel because they knew that she would say positive things for them and she wasn't going to be called by the prosecution? I mean, I don't mean positive things for them in a way that's not truthful, but they knew that this person had some good testimony to give, and so they subpoenaed her, and she wasn't going to be a government witness as to the tested issue. It's hard for me to speculate exactly what their reasons were. That certainly could have been one of the reasons for calling her at that time. The question he asked her I think that would be consistent with where you're going, Judge, is what was the reason why you left the Houston Police Department, a personal question, and her answer was that, you know, I believe that there were problems with the integrity of the crime lab. I think that raises an important point, though. I mean, she was talking about a personal reason why she left employment, and that was the question at issue, and so I don't think it could be consistent with her duties at Lone Star College to be asking a personal question about why she left a former job. But to get back to the rest of your question, Judge Alrod, there were other acts that aren't covered by Lane v. Franks. There were statements made to the press. Ms. Culbertson actually was invited and voluntarily met with the Harris County District Attorney's Office on two times where she sat down with them and told them about her concerns, and so I think those would be out of the context of Lane, but they're certainly not covered by Garcetti because they're not performed as the, you know, essential functions of her job. Now, I do wonder, you may be right, but Garcetti is at least related to that. Garcetti was very concerned about the quality of the work that he was seeing and complained in the wrong word, reported the situation. Maybe the pleading stage, we don't know enough about that, but that does seem similar to what your client, one of them, did. Well, you know, I think looking at Williams v. Riley, you have to look very carefully, this court's decision in Williams v. Riley, at the official duties, whether it was taken pursuant to their official duties, and I agree with you. The appellees in their argument, they say that that's a factual determination. It's really hard to do that at the pleading stage. I think when we get past the pleading stage, the evidence is going to be that it was not part of her official duties to be testifying as to her personal reasons as to a former job, and it certainly wouldn't be part of her pursuant to her official duties to be speaking with the press. When did she speak to the press? Was it towards the end of September? I think as pled, Your Honor, it would have been middle to second half of September. The retaliation campaign, if that's what it was, was already underway. Would there be a causation issue? Again, we're pleading. Whether a late statement to the press, I don't know if it was which one of your two clients did it, but I thought it was just a few days from the end of September, and the new contract was about to be entered that would cut off Lone Star. So it seems to me there's a causation connection doubt there. And there may be, and I think that would be an argument to make to the jury ultimately in this case. I'm looking at it. It looks like September 17th was the first publication in the Houston Chronicle. What date? Excuse me. No, I didn't have the date. September 17th, the Houston Chronicle published an article and quoted Culbertson and Long on that date. And only a few days before, the Commissioner's Court had heard about this issue, and they still hadn't issued a final decision. And so an argument can be made that causation had happened earlier, but I certainly think on the pleadings, and I think we'll have evidence to get to trial on this issue, that these statements to the press played a role in the termination. There are other hurdles along the way, but should you get to trial, that would be that. I'd like to address briefly the county's argument. Actually, I'm going to turn back to another one of Rachel Palmer's arguments, which has to do with prosecutorial immunity. She argues that she's entitled to prosecutorial immunity. In essence, she's asking the court to expand prosecutorial immunity to places it's never been applied before. That's contrary to Hoogvee-Watson directly, if it was dealing with administrative duties and things like that, isn't it? I think the Supreme Court has held if it's an administrative function, then there is no prosecutorial immunity. And I look at this as a personnel decision. If we can even go that far, I don't think the pleadings take that there. But in her best light, it would be a personnel decision. Let me ask you, what is your claim against Palmer? What is your precise claim against her? Interference, retaliation, First Amendment retaliation for my client's exercise of their First Amendment rights, tortious interference with contract, and tortious interference with prospective business relations. But doesn't Beatty versus Madison County pretty clearly say you have no claim on retaliation, even if she had an improper motive in what she was doing, wasn't protected through some mechanism, whether it's prosecutorial immunity or something else? She was not the actor. She did not make the decision, besides in Madison County and in two different places, in our opinion. For example, the reasoning of plaintiff like yourself has no relation to the liability of the individual, even if you compute her bad notice to the final actor, the individual herself who was not making the decision on termination is not liable. You're absolutely correct that the court does say that twice in the Beatty opinion. We have two responses to that. One, the issue before Beatty was not individual liability. At the point in time that opinion was issued, the individual defendants had already been dismissed from the case. So to the extent the court says that, we believe it's dicta. But most importantly, in a previous panel of this court, in Jett versus Dallas Independent School District, the court held that an individual could be held for First Amendment retaliation in the employment context, even if they did not make the final decision. In fact, the court said what matters is whether that defendant caused the adverse employment action. And the court went even further. You're talking about the cat's paw argument, are you, which is that somebody who's making the decision actually forces it through somebody else. Is this at all comparable to a factual situation in the case you're talking about that we have now? I think so, Your Honor. What happened in Jett, and this was, I think, before the cat's paw analysis even hit the courts in 86, was that the individual defendant told other people, you need to fire this person. And ultimately, the individual that did that was not the person that made the decision, but the court still found liability. And the court went further, and they rejected qualified immunity regarding the argument, whether it was unclear whether an individual defendant could be held liable in such circumstances. So I think Jett is controlling. I'm having a really difficult time discerning what basis the case was dismissed by the district court. What do they determine? Did the court dismiss the case for failure to state a claim because of causation or because of Garcetti, or was Pickering and Garcetti even raised to the district court? I mean, what was the basis of the ruling? Your Honor, Garcetti, as far as I remember, did not come up in the opinion. Pickering was not mentioned in the opinion. To be honest, the majority of the opinion dealt with, in my opinion, dealt with the point of state law, causes of action. I'm just trying to figure out what was the legal basis for finding this failed. And so that we can then, of course, we're not limited to that. If it failed to state a claim for other reasons, we would affirm. It was not clear to me. My best take, Your Honor, is that the constitutional claims were dismissed under 12B6 for failure to state a claim, and the state law claims were dismissed under the Texas Citizens Participation Act. I want to get back to Judge Southwick's last question also. I think that Kenny B. Weaver also shed some light on this Madison v. Beatty argument, and Kenny B. Weaver, the people that got sued, did not make the final decision to end the employment either. What they did was they set a chain of events moving that ultimately led to the plaintiff's termination in that case. Well, they were boycotting sending their people to that academy, which is not quite what we're dealing with here. It had a direct effect on the academy that people were not going, as opposed to – and that decision was made, and that was the harm. My understanding is that the plaintiff, in his opinion, was not fired, and so the harm was occurring to the academy, to the underlying overarching school, whatever it is that was running the academy. So I'm not sure it's a complete match, but it's a fair point. Okay. I think that one of the plaintiffs – one of the plaintiffs, Shirai and Kenny B. Weaver, resigned, but one of them was fired, and they were fired because the school didn't have enough business. And so I see it just like the Lone Star contract here. When they got rid of the Lone Star contract, Lone Star could not keep the plaintiffs in this case. It was just as good, if not better. And Kenny said one of the plaintiffs was fired, but one of them was not. They were still finding harm. I'm not sure in what way, but it was certainly affecting the school, the academy's income, I suppose. So the academy was not the plaintiff. I think in this case, Lone Star College obviously had an effect. They lost the contract, and the direct result of that was my clients and the plaintiffs in this case lost their jobs. And then do they have a state law claim that they couldn't get a job afterwards, too? Yes, Your Honor. Tortious interference with their Atwell employment contracts at Lone Star and then tortious interference with the prospective business relations, which is what you're referring to. And you're appealing that dismissal also? Yes, Your Honor. And I'll move on to that. Those claims were dismissed under a relatively new law in Texas called the Texas Citizens Participation Act, TCPA. As you've seen in our briefing, there are a lot of issues in regards to the TCPA, but I think that this appeal can be resolved very quickly, and that is because the TCPA only applies to certain protected individuals, and those are individuals who engage in the exercise of the right to free speech, association, or petition. The statute is meant for a certain class. And under the TCPA, a movement must first prove by a preponderance of the evidence that they actually engaged in protected activity. They must show the court that they're entitled to the protections of the TCPA. In this case, Ms. Palmer did not meet her burden of proof. In fact, she offered absolutely no evidence. The only thing she did was point back to the plaintiff's pleadings. There was no evidence attached. We believe the plain language of the statute makes it clear that the plaintiff has failed to meet her burden. Does the defendant deny in the answer that the conduct occurred? Kind of one of the unique procedural aspects of this is there was never an answer in this case. So there's no answer. So that's what I couldn't find, and just what I was trying to figure out. In the record, there is deposition testimony. I think the general answer to your question, Judge, is that she denied a lot of the things that the plaintiff is alleging, or she could not remember a lot of the things that the plaintiff was alleging. So she didn't say, yes, I said it, and it was the right thing to do because you're not trustworthy,  No, Your Honor. She didn't stand on her. There's no evidence in the record that she stood on her statements. In fact, there's no evidence that she admits making them. It's my understanding, yes, you're correct, Your Honor. Is the Texas case law split on whether or not you have to admit making them right now? And we're bound by Texas law on this, right? Yes, Your Honor. I mean, it is literally cases are coming out each week, and both sides have been following them. Now I've been sending 28 Js. And I think there's one case that I want to point the court's attention to, and that's a recent opinion out of the Dallas Court of Appeals. It's Pickens v. Cordia. It's in our Rule 28J letter, and I think it's mentioned in the police letter too. They make clear that pleadings will not suffice for meeting the burden when a defendant denies the actions in the pleadings. But we don't have that here, correct? We don't have a defendant denying in the TCPA claim. I thought you just told us. There's no answer to that. I think that it would be either it's denial of some of the allegations, and I can't remember on the rest of them, Your Honor. But we have the deposition where she denied. Do we consider that or not? Do we consider that she denied it in the deposition, or do we have to ignore the deposition for purposes of analysis? Well, I think this is the prima facie burden, the first step of the analysis, Your Honor. So you believe they have to come affirmatively and show that they admitted making the statements, and so the silent record on this is the fatal infirmity for them, not for you? Yes, and it's because the statute specifically refers to a preponderance of the evidence. I think that plain language shows you've got to come forward with something. I think that ends the TCPA analysis. Should we certify that to the Texas Supreme Court about whether or not you have to admit making the statements? It's important. It involves the First Amendment and government and all sorts of things. I think it's an important issue, Your Honor, and I think that the law is unclear right now in that area, and so any help from the Supreme Court would clarify things in this area. Otherwise, we'd just make a guess. Well, I think that the court can look to the court of appeals decisions that are coming out. I think that they look at other Texas Supreme Court precedents. I don't think the court would be making a guess. Well, an educated guess relying on the Texas Court of Appeals. Have any of the court's appeals allowed a TCPA claim with no affirmative representation by the movement? To my understanding, they have. If you read between the lines of opinions, it looks like they have, but the issue was not raised like we're raising it here. There was no argument about whether there was a burden. The courts never blessed that? As far as I know, the courts have not blessed that, Your Honor. I know that there was a letter last night from opposing counsel, and they told me I'm wrong on a recent case that came out, but as far as I know, they have not blessed that, Your Honor. Okay. Well, I'll ask them. Okay. Another issue why we don't think the TCPA should be applied in federal court is because or why the TCPA should not apply here is because we don't believe that it should be applied in federal court. And the basis for this argument is the Supreme Court's decision in Shady Grove. And in that case, the Supreme Court provided a two-step process that can avoid wading into, as they say, avoid wading into the murky waters of the Erie Doctrine. And under that test, the first step is to ask whether the federal rule of civil procedure answers the question in dispute. We believe that the relevant question in dispute here is, under what circumstances shall a claim be dismissed on the pleadings and even evidence beyond the pleadings? And we think that Rules 12 and 56 squarely answer that decision, that question. And as such, the TCPA cannot be used in federal court. I'm aware that the Fifth Circuit has applied anti-SLAPP motions in federal court before. I think there's two or three Fifth Circuit decisions. In none of those cases was this issue raised. The court basically assumed that it could be applied in federal court without reaching that decision. In a recent opinion, I think in Mousey v. Bagby, the court kind of made that clear that it hadn't been decided and they weren't going to decide it because it hadn't been raised at the lower court. Have any other circuits done what you're asking us to do? In some respects, yes. The Ninth Circuit has applied anti-SLAPP motions in federal court. But since that initial holding, they've kind of gutted their first decision. They found ultimately that the anti-SLAPP provisions in the California statute conflict with the discovery rules. And so although they will apply the anti-SLAPP motion, they allow discovery under federal court rules, which makes the motion much more like a Rule 56 motion than what we have here. I mean, one of the issues why this is so different from the federal rules is that discovery was stopped in this case. We got to take two depositions of one hour each, and I presented reasons in our brief why they were basically meaningless depositions. And so in the Ninth Circuit, they said, yeah, they apply, but we're going to cut out some of the things that really conflict with the federal rules. The Second Circuit, Your Honor, has found that anti-SLAPP motions apply in federal court. I think in a 2010 decision, Godin v. Shanks. That's before the Seventh Circuit right now. I've listened to the oral argument in that case. They expressed some concerns over it, but I don't have an opinion on that. So we wouldn't be creating a circuit split if we were to rule either way on this at this point? I don't think so because I think the Ninth Circuit has cut their decision in half since they originally made it. And even recently, there's some Ninth Circuit judges that have been expressing concerns over their original opinion. I think the court would be in conflict to some extent with the Second Circuit, but even that statute is a little bit distinguishable from the TCPA here. Are you going to be talking about the attorney's fees in this presentation or when you come back up here? I'll try to get to it real quickly now, and I can finish up in rebuttal. The district court, after this case was dismissed, upon motion by Rachel Palmer, awarded something like around $82,000 in attorney's fees. The main reason why we think that that award should be reversed is because there's no evidence that Rachel Palmer has actually incurred the attorney's fees. The evidence that was presented was that Harris County paid for it, but we have nothing to show us that Ms. Palmer, if she's awarded fees, has to pay Harris County back or that she's even willing to do so. Well, isn't that really between Harris County and her? Isn't the statute written strongly enough that these are fees actually charged for representation? And it certainly sounds equitable for her to pay the money back, but that's up to Harris County, I would think, not to this court to deny recovery altogether. I think that part of the reason why the statute limits it to incurred is the purpose of the statute is to protect people that can't pay for their own fees and they get bullied in court and don't have the money to pay for it. And I think that's why they're looking at the incurred matter here. And the result of this will be a significant windfall to Ms. Palmer, who never paid for these fees, never had to worry about paying for a defense. She will be awarded with $82,000 plus, and as it stands now, can just tell the county no thank you. I don't think the statute and the purpose of the statute means that it reaches that. You're not challenging the amount of the fees, or are you? Because there's some lodestar discussion in what reasonable fees are. We did challenge the fees below, Your Honor, and we had a couple of major objections. One was that we thought that the district court used an improper standard. The lodestar was used by the opposing counsel before the trial court, and so we think that the lodestar should be used here. Instead of following the lodestar, the district judge basically put the burden on the plaintiffs. The district judge also said in his order, and I just didn't have time, that a rough approximation was the standard, and that's simply not the standard under Fifth Circuit law. I'll save my return for a moment. May it please the Court. Kate David for athlete, Rachel Palmer in her individual capacity. The court asked Judge Hughes how he ruled on this and what he was ruling on, and if you look at his opinion, while it's not maybe your normal language, he does address the anti-SLAT statute, and he dismisses the tortious interference claim pursuant to that statute, but then he also says that it would fail under 12b-6 as well, and the retaliation claim fails under 12b-6 as well, for the reason that the plaintiffs in their complaint can point to no illegal activities by the defendants that caused their injury, and I think Judge Southwick was getting to this when he was talking about the causation chain, which Judge Hughes also hones in on, and so I think a little bit of the background is important. ADA Rachel Palmer was the deputy chief of the misdemeanor division for all relevant times of this appeal, this complaint, and as such she coordinated the breath alcohol testing both for HPD, because the DA's office handles HPD cases, and then also for the Harris County Sheriff's Office, and so she was working with plaintiffs Culbertson and Wong when they were with HPD, and then also when they moved over to Lone Star, and in the course of this, of working with them, she had some issues with Plaintiff Culbertson's credibility, reliability, showing up for things, which she reported to her supervisors, and which she ultimately, I'm sorry, which she reported to her supervisors, and according to plaintiffs in their complaint, also reported to members of the Sheriff's Office and of the representatives from commissioners. That's kind of vague. When you say that she had issues with her credibility, is it because she was out speaking, or are you saying that this arose from completely, or her testimony in these cases, or are you saying it's completely unrelated? That's fair. No, it's all about the testimony in cases. So you'll see in the record there's a memo that Rachel Palmer wrote to her superior. It's a 284 in the record, where she talks expressly about why they would prefer not to use Ms. Culbertson as a witness in cases where they don't have to, because they have issues with her saying she's going to show up at certain times, not showing up, telling the prosecutors one thing before a trial, and then saying something else on the stand. So she says, you know, I just prefer not to use Ms. Culbertson. Do we use any of this in determining, in evaluating this case at this standard, at this stage? Well, it does go to causation. That's what I was trying to talk about, the causation. Okay, but do we go to causation at this level? If it's on 12b-6, am I supposed to be looking at whether or not she could actually do this through her network of reasons, and whether the cat's paw doctrine applies, and all of these sorts of things? Now, those are two different questions, I think. Number one, under 12b-6, yes, you are looking at the facts and taking all of the facts in the complaint as true. And you're saying, even if all of these are true, does this support the elements of this claim? But we're not looking at the specifics of the memos, though, are we? Well, we're looking at, and Judge Hughes, I think, was looking at, whether there was any actual retaliatory action, whether there was any causation. But I'll leave that and go back to you. Let me bring up what I may be interrupting your answer. I am, to Judge Elrod, but it's sort of a premise for what you're saying. The way Judge Hughes wrote the opinion, he never identifies whether it's 12b-6. He just says dismissed. He does say TCPA, which would be the special rules of the class. He did have limited discovery, allow limited discovery. And you are now telling us about some things that either came through discovery or otherwise were introduced. So it seems to me, to the extent he considered that, that he somewhat converted this into a Rule 56 without announcing it, that he was going to convert it. I don't think that he was converting the Rule 56. It seems to me that one of the biggest hurdles for you, I'm not saying it's outcome determinative, is that this is at the pleading stage and not at summary judgment. I did think he was getting a little ahead of himself, but the trial, there may be something else, depending on what happens there before you got to the trial. Aren't we typically talking summary judgment kind of evidence and not pleading? Aren't you already getting into summary judgment evidence and not pleading? Well, I think if you put that aside and if you just focus on Judge Hughes' opinion and what he focuses on, which is causation, that's an element that they have to have sufficient evidence on to survive 12b-6. Well, they don't have to have evidence. I'm sorry. You have to have facts that, if true, would support that claim. Right. And the idea is that she's very powerful in the testing community and she's supervising two of the programs and she's going to the commissioner's court, who's extremely powerful, telling them to, taking the facts as true, telling them to ditch anything associated with this person because she's poison to the program. And so then the commissioner's court said, we don't want any poison in the program. We want easy people to deal with. We want to keep our system going the way it is, and we're going to discontinue that contract because we don't want to have to deal with her. That's the causation analysis. Well, and the other thing we get into with causation is, and you talked about this a little bit with the Beatty case, and there was a recent case out of your court that we talked about in our letter brief, the Morabee Hughes case, and an issue with causation here is that you have an ADA who has two levels of supervisors between her and the DA, who then has the DA and the sheriff's office who are going to commissioner's court giving their recommendations. Then you have commissioner's court, which is an elected body of five commissioners and a county judge who vote on the contract, on the Lone Star. And by the way, this might be important, the Lone Star contract expired on its own. They didn't cancel it. They didn't breach it. No one's alleging that they did. It expired. Then you have the commissioner's court deciding, are we going to continue our contract with Lone Star, or are we going to contract with DPS? So they vote to contract with DPS, and then Lone Star, after the Harris County contract goes away, decides to fire two of their three technical supervisors, the plaintiffs in this case. Right, because they don't need them anymore because they don't have the demand of the work. Absolutely. Absolutely. And the demand of the work was reduced in the plaintiff's theory because the supervisor went and told everybody who was in power that these people were no good and that they didn't want to deal with them anymore. But the problem they have is the Kenny V. Weaver problem, which is even if you take everything that they say is true, they aren't alleging that Rachel Palmer ever went to Lone Star and said, we're going to get rid of you if you don't fire these people. In Kenny V. Weaver, you have police chiefs and sheriffs who make the decision of where to send their officers calling the owner of a police academy and saying, we don't like your instructors. You better fire them or we're pulling out. So is your position that there's causation through the commissioner's court vote, but there's a break in causation for the decision of Lone Star to actually terminate? I think there's two breaks. I think, number one, Rachel Palmer is not a final decision maker for purposes of Beatty. What about Jett? You don't have to be the final. You just have to influence. And that's really consistent with employment laws development generally as well. Okay, and that's fine. The problem is if you look at the complaint and you accept everything is true, they don't make any allegations that Rachel Palmer has the kind of control that she would have to have over commissioner's court, the DA, or Lone Star to satisfy the cat's paw analysis. They're not even alleging. There are no facts in the complaint that say Rachel Palmer was telling the Harris County commissioners how to vote and they were listening. All of their facts are she says this isn't a good witness. I don't like this witness. I don't think that she's credible. That's all they can say. She says she thinks that DPS would be a better provider of the service. And they don't even allege it. I'm sorry. I was trying to find the right word, but I was too quick. Did you finish your response? Yes. I'm the one who sort of triggered this cat's paw label. I don't think that's the right label for this because I think you don't have the measure of control with Palmer that in the general cat's paw case you would have. But this is a case in which it's alleged, regardless of depending on whether baby is good law or not, on this point, and maybe it is, maybe it's not, if it's good law, then I think that's a fairly substantial error in your quiver, if I put it in the right place. Maybe it's on your bow. But if it's not good law, then what we're looking at is very much what Judge Elrod is saying, that she set in motion this negative vote by the Harris County Commissioner of the Court. And you said the county judge also votes on it, so it's not just the five? He's one of the five. There are four county commissioners and a county judge. Okay, and they have not been sued individually. It's Harris County itself, the county. Nor have they been alleged to have any retaliatory motives here. Okay. So regardless of whether they had any retaliatory motive or even particularly cared, they were willing to buy into this desire by the DA or an important member of the DA's operation not to employ these people anymore. So that's not cat's paw, but it is a cause-and-effect relationship that needs to provide... to the ultimate adverse action, I believe, is what is required on a retaliation law. Does that fit here? You'll say, no, why not? Well, and I think that that's where it's important to look at the more of a use case. And it's even a closer... It's not... It's even closer for us than babying. And what happens in that case is the mayor of a small city has issues with a city employee, and according to the city employee, taking his complaint, all is true, the reason the mayor has problems with him is because he supported the mayor's opponent in the election in a small town. And so the mayor goes to the city council and makes all of these statements about why this guy isn't good at his job, he's stealing money, he's doing all these terrible things. And city council, who's the only body, the only person, the only entity that has the power to suspend this employee, suspends him. He then brings an individual claim against the mayor, and this court says, that doesn't work, not final decision maker, doesn't matter what they said to city council, city council made the decision, you're out. Does that answer your question? Well, I don't know, but it is. You have to read it. It's part of the analysis. And I just want to talk a little bit about immunity, because if we get to that point, I think it's important to talk about the fact that the Whoopi Watson case does talk about how it is our burden to... When is that in the brief, the Moore case? No, because it just came out like two weeks ago. Okay, so you're saying... It's in the letter brief that we filed. The letter brief that you just filed this morning? Yes, ma'am. Okay. Yes, it just came out. In fact, it's not even on Westlaw yet. I wish I had read that earlier. But the immunity question, prosecutorial immunity, so there was a representation earlier, I just want to clear up about the administrative function. While it is the general rule that prosecutors do not have prosecutorial immunity for serving investigatory or administrative roles, the Supreme Court in the Vandip Camp case talks about a situation where the criminal defendant sues not the DA or not the prosecutor who was trying her case, but the supervisors of the prosecutor for the way that they trained the prosecutor for how they use their computer system, for how they present evidence. And the same arguments were made that were made here, that that doesn't apply, that doesn't fall under prosecutorial immunity. And the Supreme Court says, no, if you look at the policy behind prosecutorial immunity, what we're trying to do is we're trying to shield behavior when a prosecutor is acting as an advocate. And just because they were at the supervisory level making decisions at a higher level that applied to lots of cases, that doesn't mean that they lose the shield of prosecutorial immunity if it's a kind of function that then has an effect in the courtroom. And we have a similar situation here where you have the deputy chief of the misdemeanor section saying, I don't think we should use these plaintiffs. If you look at all of their allegations against Rachel Palmer and plead them, and they're all, consider them all true, all that they can say is that she says that the witnesses aren't credible and that she thinks DPS would be a better service provider for this breath alcohol testing, which is then used in every misdemeanor prosecution. In Hoog Watson, we've construed the prosecutorial immunity very narrowly, haven't we? This would be a vast expansion of this circuit's construction of that, wouldn't it? I don't know that I would say vast. I think it would expand it. This would expand it beyond anything we've recognized and be somewhat inconsistent with Hoog Watson, wouldn't it? I think it's a different situation. I think because here you're talking about someone who actually has a hand in selecting all of the expert witnesses they're using in all of the misdemeanor prosecutions. And, I mean, if you look at Appellant's own example, what they say is that, and I don't want to mess this up, I want to quote it, they say that immunity is, you look at, it's aimed at protecting prosecutorial decisions within the context of prosecution, such as from defendants alleging constitutional rights violations based on prosecutors' use of the testimony of expert who she did not believe was credible. They're saying it applies there, but if here you continue to use a prosecutor in all of your cases who you don't believe is credible, then they're arguing it doesn't apply, and that doesn't seem to fit with the policy behind prosecutorial immunity. This Moore case that you cited to us, this is not a published case of this circuit, is it? It has not been published, no. No, it is an unpublished case by which we are not bound. It's true, it's true, but I think that it shows, it goes to their argument. Well, I don't think you mentioned that when you were talking about it. I didn't think here you say it's, well, it's not published, but I think it's persuasive authority. Did you say that? No, I apologize for that, but I think it goes to their argument that Beatty was dicta and it doesn't apply in this circuit. I think Beatty has been followed in other cases, and that was just a recent case that seemed to be fairly on point factually. It does sound like it's on point, but I'm... We will take a look at it. Appreciate it. And then on the anti-slap statute, just a little bit about that. You asked if any of the courts below had addressed this issue of whether the defendant had to affirmatively embrace... No, I did not say courts below. I said courts in Texas. They are not courts below our court. I apologize. Texas courts, and the appellant was correct that the Texas Supreme Court has not addressed this. The two Houston courts of appeals have said that under the evidence standard in 27.006 for the TCPA where it says pleadings and affidavits are evidence, that you can consider the pleadings. And one Houston court of appeals decision, Jones v. Calkins, has said that the pleaded claims demonstrate that the TCPA apply and that you can plead it just based on the face of the complaint. Right, but you didn't plead. I'm sorry. You haven't pled. Just the plaintiff's complaint. Solely. In that case, all they looked at, it was in Texas courts, so all they looked at was the petition. They said if the petition is based on allegations, based on the communications about public concern, that carries the defendant's burden under the anti-slap statute. Is the defendant denying that they made all the communications at issue, or is the defendant admitting that they've made all the communications at issue as you stand here? It has not gotten to that point in the trial court, but I will tell you she's not denying that she spoke out about the credibility of the witnesses, and she's not denying that she recommended DPS, that Harris County contracted DPS. She admits those things. We'll have to make a comparison. There are some depositions, and from hearing from opposing counsel, I thought, without misrepresenting, if you can correct my sister, that there was deposition testimony, that she denied some aspects of what is said in the complaint in the deposition. So whatever you want to say about whether that's quite right, relevant, but does any of that, which is evidence in this record, though how it's to be considered is unclear because this is a dismissal, does some of that evidence attack what you need in the complaint insofar as proving what you're saying now? No, no. What happens in the deposition, and first of all, I don't really think that it is properly considered under the TCPA, which says you only look at the pleadings and the affidavits. So you don't want us to look at the deposition? I don't think that you need to. I think that we objected to that below, and the court denied our objection, so it is in the record. And in the depositions, she does say that she doesn't remember specific dates, specific things that she says, but she, when asked directly, you know, did you have problems with Ms. Culberson as a witness? Did you have issues with her credibility? She says, yes, I absolutely did. She doesn't deny that she made any of the statements at issue. She doesn't deny that she recommended DPS or preferred DPS over Lone Star. She doesn't deny that she thought that Culberson was a bad witness. Doesn't deny is different than she affirmatively stands on, I did do this. Yes, she does not do that in her deposition. She does not go through each one. Those questions were not asked. But they had only an hour or something? Right, right. It was a limited deposition. And just quickly to address Pickens, which is their case out of the Dallas court, where the Dallas Court of Appeals did say a party can't deny making the free speech and still carry their burden under the TCPA. Pickens was completely different. Pickens' petition didn't allege, didn't know who made the speech at issue. Pickens involved an anonymous email that was sent out and a lawsuit was filed, a sister against her brother saying, I think you sent this email, I know it wasn't your name, but I think you sent these disparaging comments. There's then some limited discovery where the brother says, I didn't do it, I don't know where this email came from, I had nothing to do with it. And there's no evidence at all that that was her free speech, that that was his free speech. So it's a little bit different than here where you have affirmative claims on the face of the petition, or complaint, I'm sorry, that Ms. Palmer made these statements and then they say that's what caused this issue and all of their tortious interference complaints are based on her lobbying of commissioners' court and she never denies that she spoke to representatives from commissioners' court or that she supported DPA. So I think it's a little bit distinguishable.  the TCPA statute on attorneys' fees says that the court shall award to moving party court costs, reasonable attorneys' fees and other expenses incurred in defending against the legal action. And there are no Texas cases that I know of directly on point that talk about our situation where the fees were incurred, but they were paid by a third party. But there was, there's a case that... And what do those authorities say? I just said there isn't, there aren't any authorities. There aren't authorities. I'm agreeing with that. But there is the one case that appellants cite in their letter brief where the court talks about whether incurred, whether fees were incurred when bills were sent to a husband and wife and it's unclear who actually paid them or who was liable for them and the wife had been a defendant, but then the husband was a defendant and the defendant was the actual successful movement under the TCPA. We have all that paid and incurred litigation in the context of personal injury law in Texas and that's gotten very strict about that it's not really incurred unless they actually have to write the, write the check to the doctor and if it hasn't really been paid. Even though it says paid or incurred, the Texas courts have taken a really strict interpretation of incurred in that context. That is true and there, but then there are other cases where the Texas Supreme Court is talking about not in that context. The cases that we cite in our brief where the Texas Supreme Court is talking about even if you're representing yourself, you're not incurring actual fees, that's okay. And part of it goes to the policy of the TCPA which is a little bit different than the policy in the cases you're discussing. And one of the reasons for awarding attorney's fees and sanctions are also allowed, although judges do not do that, is to kind of shift the burden of paying for this expensive litigation onto the party that actually gets to decide to bring it if it's later determined not to meet the TCPA standard. And that was one of the reasons that the anti-SLAPP statute was enacted. Okay, what about the part that says in the interest of justice or that part of the phrase, or the similar, the limiting language, perhaps limiting language? It's interesting, I haven't seen that come up in the context of incurred, but it has come up in the context of whether attorney's fees are mandatory or not. And the argument being, well they're not really mandatory because they have to satisfy these provisions. And the Texas courts that have looked at this recently, the Houston Court of Appeals, and Schimel v. McGregor, and the Deschate case out of El Paso, have both said that they're mandatory regardless of that language. Now, how that is gonna affect incurred, I don't know if they're gonna go the same way or not. And again, the Texas Supreme Court has not spoken on this issue. So it's open whether or not your client is automatically entitled to this under Texas law. No, now the Texas Supreme Court hasn't talked about it. Right, but I mean it's open, yeah, because... Yes, the Texas Supreme Court has not talked about it. The only courts of appeals to talk about it have said, you know... Let's talk about the amount. Okay. That's a lot of money for two depositions in a no answer case, isn't it? Well, there were two motions to dismiss. There were reply briefs. There were two hearings. There was, I think, two, I'm sorry, two mediations. Did the district court make the appropriate findings that they would need to support these fees? I think that they did. I think that they did, and... What did the district court do that would support these fees? Well, if you look at... Sorry, I don't have the opinion in front of me. The district court says, talks about the fact that the reasonable, that the fee amount is reasonable for the market area, because that's one of their arguments. They talk about the fact that plaintiff... I mean, I'm sorry. I believe Palmer had the right to have her own defense, to direct her own defense. One of the arguments in the trial court was that we should have relied more on the Harris County Attorney's Office and that we should have relied more on the other defendant at the time on their counsel and kind of just relied on their briefing, and the judge there says, no, it was fair for them to file all of their own briefing, to preserve their own record, to go to the depositions on their own, to go to the mediations. The trial judge looks at all of that and addresses that in his opinion and says that he thinks that the amount is reasonable and that he thinks that it's also reasonable for Palmer to have her own lawyers who defend her own case. So the rough approximation statement is just a stray statement? It's a rough approximation. I'm sorry, I don't recall that. When the district court said it was a rough approximation of the amount of the fees, that's just a... We should just overlook that, because all the proper findings are really there. Well, and you can look at the evidence below, too. I mean, we submitted all of our bills. We submitted... Are they all up here for us? Yes, they're in the record. All of our bills are in the record. They are, and if you look at the Texas Supreme Court's recent case on the Lodestar analysis, they talk about what you need, and everything that they say that we need is in there. It's the experience of the lawyers, the hours spent, all of that. Okay, if it's in there, we'll look at it. Anything, do you need to wrap it up? Okay, no. Thank you, I appreciate it. Okay, thanks. May it please the court, I'm Mary Baker, attorney for Harris County and for Rachel Palmer in her official capacity, and in the really brief time I have, I just wanted to address the court's issue about the basis for the district court's decision. I believe as well that the basis for the district court's decision was one of causation. As you know, as you well know, in order to make a 1983 retaliation claim against Harris County, which is the only claim which was asserted against Harris County, the plaintiffs need to establish, first of all, a constitutional violation, and then after that, a custom policy or procedure of a final Harris County policymaker, which was the moving force of the alleged constitutional violation. And in his analysis, Judge Hughes said, first of all, in the introduction, page one, the plaintiffs have several theories of liability for indirect injury. So it seemed to me that initially he was perhaps even making a finding about the nature of the constitutional violation. And let me say parenthetically before I forget it, I regard Judge Hughes's decision as going off completely on a 12B6 and not as a conversion to a motion for summary judgment. There were no... Is there nothing in the opinion that relies on any of the evidence? I haven't looked for that. I have not seen anything, Your Honor, as it applies to the county. The county was not, obviously, the county was not sued under the anti-SLAPP statute. The county did not have its deposition taken other than Judge Lykos and ADA Palmer had their depositions taken. But no county representative. So as it stands with regard to the county, I believe that Judge Hughes went off on just a straight 12B6 looking at the allegations in the pleadings. He assumed that, for example, Judge Lykos had recommended a contract with DPS. That's in his opinion, you'll see that. And he talked about commissioners' court, obviously, the final decision makers, the final policy makers for the county in this type of an issue. And there he said... There he said at page four, two at-will workers at a regional college were released. Temporally, the firing followed the expiration of a contract between Lone Star and Harris County. And we've already talked about that, but the contract was not terminated. It had expired. The lapse followed a decision by the county's policy board, the Harris County commissioners. Its decision came after negotiations among officers from the county, college, and state. Then he says... The plaintiffs picture all of the actors rubber-stamping Lykos' wishes is unsupported. Had they automatically followed her counsel, they are still deciding for themselves. So, in other words, I believe Judge Hughes was telling the county, there is no direct causal link. Which, as we know... So if they knew of... And just assume arguendo that there's an unconstitutional intention. If they know of an unconstitutional intention but receive information knowing that... As long as they decide for themselves, they're not on the hook, it's not imputed to them if they know about the bad motives? I believe that's correct, Your Honor. Okay. Even if they know. I know that they're not... It's an easier case if they don't know that there's a bad motive from the person giving them the information. That's right. But if they actually know of the bad motive of the person giving them the information... And this is a hypothetical, I'm not saying... Yes, hypothetically speaking. Well, you know, it's interesting because this point has occurred to me, which is in the plaintiff's complaint. They also heard from several criminal defense attorneys. And so they're entitled to weigh, one would imagine, in the county's interest, both aspects. So the plaintiffs have even pled that at a public hearing, you know, several criminal defense attorneys testified or gave statements that this was an act of retaliation. Well, that was their opinion, and Judge Likos had her opinion. And the commissioners were charged with making a determination for the county. And as Judge Hughes tells us, that they did independently. What's the best case for that? For? That it's automatically assumed that it's independent. Well, I don't think he did cite a case. No, I'm asking you. Yes, and I do not have a case to cite to you. I certainly do not. May I wrap up one more sentence? Okay. The other really important part of Judge Hughes's decision is that he found there was no custom policy or procedure by the county of retaliating against those with whom he disagreed. Thank you. Counsel, what do you say about the attorney's fees? You know, Harris County, what I say about the attorney's fees is Judge Southwick is correct. That's between Harris County and... Does the record support the $80,000? Your Honor, let me just say that Harris County paid the $82,000. Does the record support that recovery? I believe it does. But you're not advocating for it. I'm not advocating for it. You stand neutral. That's right. It's out of our control. It's after. Thank you so much. This will probably seem like a long time, but it's your turn again. Actually, it seems very short, Your Honor. Just a couple of follow-ups. A lot of the discussion here this morning has been about the termination, but I wanted to remind the Court that we pleaded two other actionable injuries, and one was kind of what Palmer and Harris County did to the reputations of my clients. And that was telling people publicly and privately within the prosecutor's office and without that they couldn't be trusted. And obviously not only does that chill their First Amendment rights, it affected their employment going forward, whether they could ever be hired to do this anywhere near Harris County or probably the state of Texas. So even if there's a causation issue on that direct job, do you believe that future jobs that they've been basically blackballed in the industry, for lack of a better term, if that's maybe not the appropriate way to say it? Yes, Your Honor. Is that your position? On the pleadings and the causation issue of this debate we have about Madison, Beatty v. Madison County, wouldn't apply to the direct action of harming someone by telling everyone that their reputation is no good or by what they did in investigating on the pleadings, investigating my client Amanda Culbertson for perjury and what that did to her and how that chilled her First Amendment rights. I will go quickly again back to the Madison, the Beatty v. Madison County issue. I think that what these courts are all trying to get at is causation. I don't think this is perfectly a cat's paw. I think the cat's paw can apply to part of this. But if you look at Jett and if you look at Kenny B. Weaver and if you look at Miles v. Beckworth, in all of those cases you didn't have a final actor that was being sued that made the decision. You had individuals outside that through a chain of events caused the result. In all those cases the court said that that was okay. Lastly, I think that I'll state that causation is something that should be, I think it's much more appropriate to be analyzed at summary judgment and then if after summary judgment at trial. It's very difficult to have these analysis of causation when you're just looking at the pleadings, and that's what we have here today. If there's no further questions. Thank you.